**[Cite as *A.M. v. J.M.*, 2026-Ohio-2532.]**

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

A.M.,                                          :

    Plaintiff-Appellant/          :
    Cross-Appellee,

                                           Nos. 114462 and 114488

    v.                             :

J.M.,                                          :

    Defendant-Appellee/           :
    Cross-Appellant.

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 2, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-20-382494

---

### *Appearances:*

McCarthy, Lebit, Crystal & Liffman, Co., LPA, Robert T. Glickman, and Jenna C. Sholk, *for appellant/cross-appellee.*

Stafford Law Co., L.P.A., and Nicole A. Cruz, *for appellee/cross-appellant.*

SCOT STEVENSON, J.:

{¶ 1} Plaintiff-Appellant/Cross-Appellee, A.M. ("Husband"), and Defendant-Appellee/Cross-Appellant, J.M. ("Wife") appeal from the judgment of

the Cuyahoga County Court of Common Pleas, Domestic Relations Division. For the reasons set forth below, this Court affirms.

I.

{¶ 2} Husband and Wife were married on August 8, 2015, and two children were born as issue of the marriage. Husband filed a complaint for divorce in September 2020. In his complaint, he requested that the court determine the enforceability of the parties' antenuptial agreement ("Agreement"). Husband alleged that the terms of the Agreement were vague and nonsensical and as a result there may not have been a meeting of the minds necessary to form a contract. Husband reversed course and subsequently amended his complaint to request a determination that the Agreement is actually valid and enforceable.

{¶ 3} Wife answered and counterclaimed for divorce. She asserted in her counterclaim that the Agreement was valid but requested that it be reformed to correct a scrivener's error to reflect the original intent of the parties at the time of execution regarding the division of property. She also alleged that the provision in the Agreement regarding the parties' waiver of spousal support was unconscionable and invalid as to her and requested an award of spousal support.

{¶ 4} Temporary support orders were issued by agreed entry in January 2021 wherein Husband was ordered to pay the expenses for the residence, certain of Wife's personal and health care expenses, and the children's expenses for school, day care, health care, and activities. In addition, Husband agreed to pay Wife

directly $5,755 per month for her living expenses. The parties also agreed to the appointment of Mr. Edward Blaugrund as the joint financial expert.

{¶ 5} The matter proceeded to trial over the course of 18 days beginning in January 2024 and concluding in late April 2024. The parties presented numerous witnesses and exhibits and submitted their closing arguments and requests of the court in writing. The court issued its final judgment entry on October 9, 2024, that granted the parties a divorce and made findings and conclusions regarding Husband's temporary support arrearages, the Agreement, the division of property, spousal support, child support, the children's health care, Wife's contempt motions, and Wife's request for attorney fees.

{¶ 6} Husband timely appealed and asserts eight assignments of error for our review. Wife cross-appealed and asserts two assignments of error for our review. This Court consolidated the appeals for purposes of briefing, hearing, and disposition. Husband's assignments of error will be addressed out of order for ease of analysis.

II.
**Husband's Appeal**
**ASSIGNMENT OF ERROR NO. 1:**
**THE TRIAL COURT ERRED WHEN IT FOUND THAT THERE**
**WAS A TEMPORARY SUPPORT ARREARAGE.**

{¶ 7} The trial court found that Husband failed to pay $3,918.58 that was owed to Cleveland Hearing and Speech Center for the parties' daughter's treatment for a traumatic brain injury, and $9,989 in dental bills for the family for a total expenses arrearage under the temporary orders of $13,808.58. As for Husband's

monthly support obligation of $5,755, the court found that it was paid by Husband's father, R.M., and that R.M. testified that Husband directed him to withhold funds when there was a visitation dispute between Husband and Wife. Based on R.M.'s testimony, the court found that a total of $15,000 was withheld from Wife's monthly support, and therefore, Husband was in arrears under the temporary orders in the total amount of $28,808.58 ($13,808.58 in expenses + $15,000 in monthly support) as of April 24, 2024.

{¶ 8} Husband argues that there is no temporary support arrearage because the monthly cash support was eventually reimbursed to Wife and the medical and dental bills were never presented to Husband in advance of trial. Husband also argues that the court abused its discretion by ordering him to pay the entire arrearage within 30 days of the judgment entry of divorce because it did not take into consideration his monthly income of $13,500, other personal expenses, the lack of evidence of a savings account, and his need to rely on loans from R.M. to maintain his obligations to Wife. Husband further argues that the trial court erred by failing to hear his motion to modify the temporary support, and that if it had done so and modified the support order, the modification would have related back to March 23, 2023, thereby reducing his arrearage.

{¶ 9} This Court reviews a trial court's decision concerning a finding of civil contempt for an abuse of discretion. *Perkins v. Gorski*, 2013-Ohio-265, ¶ 9 (8th Dist.). "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or

unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying an abuse of discretion standard, a reviewing court is precluded from substituting its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). Although *Blakemore* is often cited as the general standard for reviewing discretionary decisions, the Ohio Supreme Court has provided additional guidance about the nature of an abuse of discretion:

> Stated differently, an abuse of discretion involves more than a difference in opinion: "'the term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations.'" *State v. Jenkins*, 15 Ohio St.3d 164, 222 [] (1984), quoting *Spalding v. Spalding*, 355 Mich. 382, 384 [] (1959). For a court of appeals to reach an abuse-of-discretion determination, the trial court's judgment must be so profoundly and wholly violative of fact and reason that "'it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias.'" *Id.*, quoting *Spalding* at 384-385 [].

*State v. Weaver*, 2022-Ohio-4371, ¶ 24.

{¶ 10} Our review of the record reveals that Husband did not raise any of the arguments he makes under this assignment of error in the trial court. Even though Wife's multiple motions for contempt regarding Husband's temporary support arrearages were before the court for determination at trial and Wife presented evidence on the issue, Husband's closing trial brief does not contain any argument or request regarding his alleged temporary support arrearages. He did not challenge the fact of his temporary support arrearages, nor the amount Wife alleged that he was in arrears. Therefore, it is being raised by Husband for the first time on appeal. Accordingly, due to Husband's failure to raise these arguments in the trial court and

failure to argue plain error, we need not consider them. *State v. Tate,* 2022-Ohio-4745, ¶ 19-20 (8th Dist.).

{¶ 11} Even if we could reach the merits of Husband's arguments, the record does not support his arguments. In his appellate brief, Husband states regarding the monthly support payments that they "were made by [Husband] or [Husband's father R.M.] and are evidenced by [Husband's] testimony, [R.M.'s] testimony, and the bank records in evidence. Plaintiff's Exhibit 56." Plaintiff's Exhibit 56 is a lengthy document containing R.M.'s bank statements from June 2021 through July 2023. Husband does not direct this Court to any specific place within Plaintiff's Exhibit 56 or in his or R.M.'s testimony that reflects the alleged payments, nor can this Court locate one. As this Court has previously stated, "[i]t is not the duty of this court to sort through the record to root out arguments and evidence in support of an appellant's assignment of error." *Hausser & Taylor, LLP v. Accelerated Sys. Integration, Inc.*, 2005-Ohio-1017, ¶ 10 (8th Dist).

{¶ 12} Furthermore, the record reflects that the issue of the dental bill was addressed by the magistrate in January 2024. Therefore, Husband had notice of it prior to trial. As for the Cleveland Speech and Hearing bill, the transcript reference provided by Husband to support his allegation that the bill was not presented until trial refers to the information about the child's specific diagnosis, not the amount of the bill.

{¶ 13} Based on the foregoing, Husband has failed to meet his burden on appeal regarding the issue of his temporary support arrearage. His first assignment of error is overruled.

**ASSIGNMENT OF ERROR NO. 2:**
**THE TRIAL COURT ERRED WHEN IT REFORMED THE ANTENUPTIAL AGREEMENT.**

{¶ 14} At issue under this assignment of error is the language in Section 13(b) of the Agreement which reads as follows in relevant part:

> Notwithstanding anything in this Agreement to the contrary, the parties agree that upon the termination event, [Wife] shall receive from [Husband] Assets ***at [Husband's] death***, the applicable sum as follows:
>
> . . .
>
> (2) If married at least five (5) years but less than ten (10) years: THREE MILLION DOLLARS ($3,000,000.00), plus ten percent (10%) of the value of [Husband's] Premarital Net Assets, plus twenty percent (20%) of the value of [Husband's] Post Marital Net Assets, but such total amount shall be not be (sic) less than FIVE MILLION DOLLARS ($5,000,000.00)[.]

(Emphasis added.) The "termination event" was defined in Section 13(a) of the Agreement as "divorce, dissolution or legal separation[.]"

{¶ 15} At trial, Husband's position was that the terms "at [Husband's] death" were intentional and unambiguous, and that the parties agreed that any settlement to Wife would not be paid until Husband's death rather than at the termination event, which in this case is the parties' divorce. Wife's position was that this language was a clear drafting/scrivener's error resulting in the absurd outcome that her property settlement in the divorce would not be paid until after Husband's

death, meaning that she would be expected to wait potentially decades to be paid as Husband is in his thirties.

{¶ 16} The court found that in entering into the Agreement, both parties were represented by counsel who exchanged multiple emails over the course of a week when negotiating, drafting, and approving the Agreement, and that Husband's attorney was the drafter. In its final judgment entry, the court outlined both counsel's testimony at length and the details of their email exchanges. The court found that the Agreement was as set forth in an email to Wife's counsel from Husband's counsel on July 31, 2015, which expressly stated that the terms were for the payments to be made upon termination of the marriage, not upon Husband's death, noting Wife's counsel's testimony that he had never drafted a prenuptial agreement with the payment from a divorce to be paid after death.

{¶ 17} The trial court further found that in a subsequent draft of the Agreement that Husband's counsel sent back to Wife's counsel later that same day, Husband's counsel included the death language and gave no response during his testimony when asked if he did so on purpose. The court found that Husband's counsel testified he could not recall ever discussing that change with Wife's counsel and that he did agree the emails between him and Wife's counsel referenced payout amounts upon divorce rather than waiting for the death of either party to collect. The court also found that Husband's counsel, like Wife's counsel, admitted that he had never prepared a prenuptial agreement with this future payment language and

could not explain why it would be necessary when Husband already had a trust that made provisions for Wife upon his death.

{¶ 18} The court ultimately concluded as follows:

Despite [Husband's counsel's] sophistry, the Court cannot find that the parties intended that any payment to [Wife] . . . and from Husband . . . was meant to be paid after the death of [Husband]. [Husband] cannot have this argument every way: that the agreement is to be paid on death, that the amount paid is capped at the time of the divorce but not paid until death, that it is ambiguous, that it might be unenforceable, and that [Wife] has waived all payments.

{¶ 19} Citing in support the Ohio Supreme Court's decision in *Gross v. Gross*, 11 Ohio St.3d 99 (1984), which established the test for whether antenuptial agreements are valid and enforceable, the court further concluded that:

The Court cannot identify a more overreaching event than having the party without assets wait decades for a fair division of property.

. . .

. . . [T]he Court finds that [Wife] should not be deprived of the agreement she entered into which was a payment upon the "termination event" of divorce when the scribe hired by the other party put in a term that was not discussed by the attorneys in negotiating this document.

{¶ 20} Considering its conclusions above, the court then reformed Section 13(b) of the Agreement to remove the "upon [Husband's] death" language so that Wife would receive Husband's assets "upon the termination event." On appeal, Husband argues that the trial court erred in finding that the Agreement should be reformed. Husband also argues that the court's finding that Husband's counsel was not credible was erroneous. We disagree.

{¶ 21} In Ohio,

[antenuptial agreements] are valid and enforceable (1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce.

*Gross*, at paragraph two of the syllabus. "[T]he term 'overreaching' is used in the sense of one party by artifice or cunning, or by significant disparity to understand the nature of the transaction, to outwit or cheat the other." *Id.* at 105.

{¶ 22} Reformation is an inherent, equitable remedy that allows a court to change the language in a contract where the parties' true intentions have not been properly represented due to a mutual mistake or fraud. *Wong v. CCH Dev. Corp.*, 2021-Ohio-1099, ¶ 14-15 (8th Dist.). Generally, a trial court may reform a written instrument only for mutual mistake and not in the case of a unilateral mistake. *Id.* at ¶ 16.

However, when a unilateral mistake occurred 'due to a drafting error by one party and the other party knew of the error and took advantage of it, the trial court may reform the contract. [. . .] Reformation is appropriate if one party believes a contract correctly integrates the agreement and the other party is aware that it does not, even though the mistake was not mutual.'

*Id.* at ¶ 17, quoting *425 Beecher, L.L.C., v. Unizan Bank, Natl. Assn.*, 2010-Ohio-412, ¶ 44 (10th Dist.), quoting *Galehouse Constr. Co., Inc. v. Winkler,* 128 Ohio App.3d 300, 303 (9th Dist. 1998). It is not necessary as a prerequisite to the reformation of a contract that the contract be ambiguous. *Cuthbert v. Trucklease Corp,* 2004-Ohio-4417, ¶ 34 (10th Dist.); *Gooslin v. B-Affordable Tree Serv.*, 2011-Ohio-4048,

¶ 19 (6th Dist.). *See also Williams Trucking, Inc. v. Gable,* 2000 WL 739541 (8th Dist. June 8, 2000).

{¶ 23} Where, as here, reformation of a contract is sought on the basis of mistake, the party seeking such reformation must establish the existence of the mistake by clear and convincing evidence. *Wagner v. Natl. Fire Ins. Co.*, 132 Ohio St. 405 413 (1937); *Pepper Pike Properties Ltd. Partnership v. Wilson*, 2002 WL 199902, *3 (8th Dist. Jan. 31, 2002). Clear and convincing evidence is the degree of evidence necessary to "produce[] in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re M.S.,* 2015-Ohio-1028, ¶ 8 (8th Dist.). Whether the trial court's findings are supported by clear and convincing evidence will only be reversed on appeal if they are against the manifest weight of the evidence. *In the Matter of: Dorazio*, 1985 WL 7461, *2 (8th Dist. Jan. 24, 1985). In weighing the evidence, "the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 21.

{¶ 24} A review of the record establishes that the trial court's findings were supported by clear and convincing evidence. Wife's counsel testified that the "upon Husband's death" language was "[a]bsolutely a mistake" and an oversight, emphasizing that there is a separate provision for payment to Wife upon Husband's death in Section 13(a) of the Agreement; therefore, it would not make any sense to have two such provisions in the same agreement. The email exchanges between counsel, which were admitted into evidence, reflect that their negotiations and

communication were that the parties intended for Wife to receive payment at the time of the parties' divorce rather than at the time of Husband's death. However, after initially submitting those terms to Wife's counsel and representing that they were approved by Husband as the Agreement, Husband's counsel changed the Agreement to include the "upon Husband's death" language and did not inform Wife's counsel that he had done so.

{¶ 25} On cross-examination, Husband's counsel testified as follows on this subject:

> Q. (Wife's counsel): And then on the terminating event . . . how much would [Wife] get at five - - after five years [of marriage]?
>
> A: (Husband's counsel) (As read) "If married at least five years but less than 10 years, 20 percent of [Husband's] net asset value with a $5 million floor."
>
> Q. Okay, But that's not what you put in the agreement, is it?
>
> A. Correct.
>
> Q. Did you tell [Wife's counsel] that you went back on your statements?
>
> A. I don't recall having conversations with [Wife's counsel] - -
>
> . . .
>
> Q. For the record the second time, did you tell [Wife's counsel] in words or in an e-mail that you were changing what you sent to him on July 31st, 2015?
>
> A. No.
>
> . . .
>
> Q. You sent an agreement, but you didn't tell him - - you didn't tell him that you changed the terms from your prior e-mail, did you?
>
> A. I did not have discussions with [Wife's counsel].

. . .

Q. Well, you didn't tell him in an email.

A. Correct.

. . .

Q. Okay, So your claim is, in the negotiations, you went back to [Wife's counsel] and said to him, "No. [Wife] only gets the money at death." You told him that, wrote it to him, or explained it to him.

A. I sent him an agreement with that in the agreement.

Q. So you never told anyone? . . .

A. I - -

Q. Right?

A. No.

{¶ 26} Based on the testimony and evidence regarding counsel's communication, there was clear and convincing evidence that the Agreement contained a unilateral mistake which did not comport with the parties' intentions at the time of the Agreement and that reformation was appropriate to properly represent the parties' true intentions. Husband's counsel knew of the error and took advantage of it by not bringing it to the attention of Wife's counsel, and instead, simply presented the Agreement with the additional language. Husband's counsel was aware that the Agreement did not correctly integrate the parties' intentions while Wife's counsel believed that it did. While Wife's counsel mistakenly overlooked the change when he reviewed the Agreement after it was returned to him by Husband's counsel, he did so in reliance upon Husband's counsel's silence as to any changes that had been made. Keeping in mind the presumption in favor of the

finder of fact, we cannot say that the trial court lost its way when it found that Husband's counsel was not credible. *Eastley*, 2012-Ohio-2179, at ¶ 21.  His lack of forthrightness with Wife's counsel was evident from his testimony.

{¶ 27} Based on the foregoing, the trial court did not err in reforming the Agreement to align with the parties' intentions at the time of the marriage. Husband's second assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. 3:
**THE TRIAL COURT ERRED IN ITS VALUATION OF THE PROPERTY DIVISION AMOUNT OWED TO [WIFE].**

{¶ 28} In its final judgment entry, the court listed the R.C. 3105.171(F) factors that it was required to take into consideration when dividing property and made findings as to each one with specific facts in support.   Thereafter, using the formula set forth in Paragraph 13(b)(2) of the Agreement, the trial court found that:

> As to the property amount that [Wife] is entitled to under the Agreement, [Wife] is entitled to $3,000,000 plus 10% of [Husband's] "Premarital Net" which is $5,335,993.70, plus 20% of [Husband's] "Post Marital Ne[t] Assets" or $1,712,379.  The total [Husband] owes [Wife] is $10,048,372.

The court ordered Husband to pay Wife the total owed by December 31, 2024.

{¶ 29} In determining Husband's Premarital Net of $5,335,993.70, the court relied on the 2015 list of Husband's assets attached to the Agreement as Exhibit A/A1 and determined that Husband had premarital assets totaling $53,359,937 which was comprised of $18,000 in PNC Bank, $130,000 in First Merit Bank, 50% of AJAPPJR, LLC with a net worth $53,164,937 as of March 12, 2015, a 2011 BMW worth $27,000, and a violin worth $20,000.  The trial court noted that Husband's

own spreadsheet (Exhibit A/A1) showed that he had total net assets valued at $53,164,937. Ten percent of $53,359,937, the total of all these assets, is the Premarital Net found by the court of $5,335,993.70.

{¶ 30} The court then arrived at the $1,712.379 figure for Husband's Post Marital Net Assets by first determining that the net value of the property acquired after the Agreement was $17,653,397. In making that determination, the court compared the 2015 list of the parties' premarital assets that was attached to the Agreement (Exhibit A/A1) with the 2022 Cash Flow Spreadsheet submitted by Husband (Exhibit 88) to determine what new properties were acquired during the marriage. The court found that there were six properties listed on Exhibit 88 that were not listed on Exhibit A/A1: Woolworth Annex, HOB Retail, Woolworth Garage, WT Grant Retail, 629 Euclid Hotel, and Citizen's Pie. The court also found that there was testimony as to an additional three properties that were also not included in the list of premarital assets: Voss Industries, the marital residence, and 50% of 3409 Superior Ave. The court then concluded that "[t]he total of these 'Post Marital' assets is $17,653,397 [and] [o]ne half of that is the [Husband's], or $8,826,699." The court's findings included columns for the properties' fair market value, mortgage balances, and net value. Husband does not dispute these values.

{¶ 31} The court then acknowledged that the Agreement provided that Husband's Post Marital assets were to be "'reduced by any taxes and expenses (including, but not limited to, capital gains tax, income tax, real property tax, conveyance fees, brokerage fees and financing fees) that otherwise would be

incurred if such assets were sold at fair market value as of the termination event.'" On that issue, the court found that "[t]he parties stipulated that [a] broker's fee of 3% was reasonable." The court further found that there was no evidence of any taxes being paid on any entity, and therefore, the three percent brokerage fee should be used. In making that finding regarding the taxes, the court noted that Husband called Mr. Brendan Fitzgerald as a witness to testify to the tax calculations for the hypothetical sales of property. Mr. Fitzgerald had been retained by Mr. Blaugrund, the agreed financial expert, to provide the tax calculations that would in turn be used in Mr. Blaugrund's business valuation. However, the court struck Mr. Fitzgerald's testimony because it found that he was not on the witness list and Mr. Blaugrund never testified at trial nor was his business valuation report ever submitted to the court. Therefore, the court found that it was "not appropriate to take testimony related to an expert witness who did not testify concerning a report that was neither offered nor admitted."

{¶ 32} After deducting the three percent broker's fee from Husband's one half of the Post Marital assets, the court arrived at a Post Marital Net asset figure for Husband of $8,561,898 ($8,826,699 - 264,800 (the three percent fee)), which was the figure it then used to calculate Wife's 20% share under the Agreement of $1,712.379 (.20 x $8,561,898). The court added up the $3,000,000 lump sum, Husband's $5,335,993.703 Premarital Net Assets, and the $1,712,379 (20% of Husband's Post Marital Net Assets) to arrive at the total of $10,048,372 as Husband's payment to Wife for her division of property under the Agreement.

{¶ 33} Husband argues under this assignment of error that the trial court erred as follows: 1) it abused its discretion by finding under R.C. 3105.171(F)(4) that the assets of the marital estate are not liquid while at the same time requiring that the $10,048,372 payment to Wife be made by December 31, 2024; 2) it erred by omitting taxes and conveyance fees when calculating the net value of the company; and 3) it abused its discretion in finding Husband had no credibility because of violations of the mutual restraining orders.

{¶ 34} "A trial court has broad discretion in dividing marital property." *Hampton v. Hampton*, 2001 WL 777013, * 4 (8th Dist. July 5, 2001), citing *Bisker v. Bisker*, 69 Ohio St.3d 608 (1994). R.C. 3105.171(F) lists nine specific factors for the trial court to consider when dividing the parties' marital property. It also provides that the court can consider "[a]ny other factor that [it] expressly finds to be relevant and equitable." R.C. 3105.171(F)(10). We review the trial court's division of property for an abuse of discretion. *La Spisa v. La Spisa*, 2023-Ohio-3467, ¶ 28 (8th Dist.). We incorporate the abuse of discretion standard outlined above.

{¶ 35} As for the trial court's findings regarding the valuation of marital property, "we must affirm a trial court's determination if it is supported by competent credible evidence[.]" *Chattree v. Chattree*, 2014-Ohio-489, ¶ 43 (8th Dist.). "[W]hen there is some competent, credible evidence in the record to support a trial court's decision, there is no abuse of discretion." *Victor v. Kaplan*, 2020-Ohio-3116, ¶ 25 (8th Dist.)

{¶ 36} Turning to Husband's first argument, he points to the testimony of Mr. Rico Pietro, a real estate broker with CRESCO Real Estate, who testified that he was hired in 2021 to market several of Husband and J.M.'s properties for lease and/or sale. Husband states that Mr. Pietro testified that the Uptown properties could be sold for $50,000,000 and the Tudor Arms properties could gross between $13,000,000 and $14,000,000 respectively, but Husband argues that those sales would only cover the debt on the properties, leaving no cash to pay Wife. In support, Husband relies on the 2021 Global Real Estate Cash Flow report (Husband's Exhibit 101).

{¶ 37} The record reflects that Mr. Pietro's testimony regarding the Uptown and Tudor Arms properties was in response to Wife's counsel's question on cross-examination regarding which properties could be quickly liquidated into cash. Mr. Pietro identified the two Uptown properties as one of three sets of properties that could be quickly sold. While Husband relies on the debt position of the Uptown properties as reflected in the 2021 Global Real Estate Cash Flow Report to support his argument that there is no net equity in those properties, that report is not the only evidence in the record and was not considered by the court. The court utilized the more recent 2022 AJAPPJR Global Real Estate Cash Flow Report (Husband's Exhibit 88) in calculating the payment to Wife under the Agreement. Husband does not allege that the 2022 Report was not properly utilized by the court in its calculations. In the 2022 Report, the two Uptown properties were worth over $50,000,000 and carried debt in the amount of $24,205,616 and $14,962,480

respectively, leaving net equity in the amount of $13,297,004 ($4,425,170 and $8,871,834), which is well above the $10,048,372 necessary to pay Wife. Furthermore, when asked whether "*all* of [Husband's families'] property, *all* of their holdings can be liquidated," Mr. Pietro answered "[a]bsolutely." (Emphasis added.) Thus, according to expert testimony, Husband's liquidity extended beyond the Uptown properties. Therefore, Husband's argument on this issue is overruled.

{¶ 38} Next, Husband argues that the trial court erred in finding that $53,000,000 is the net equity of AJAPPJR at the time of the marriage because that figure does not include liquidation costs as required by the Agreement; that the court erred when it chose to disregard the testimony of Mr. Fitzgerald regarding the capital gains effect of the hypothetical sale of the properties because the Agreement requires the court to include a reduction for taxes; and that the court erred by omitting the conveyance fees that the County would impose at the time of sale as anticipated in the Agreement.

{¶ 39} First, Husband did not raise any of these arguments in the trial court. In his trial brief, under his argument regarding the Agreement, Husband noted parenthetically that his net premarital interest in AJAPPJR, LLC was obtained from his own Exhibit A/A1 of the Agreement as well as Wife's Exhibit DDDDDD which reflected "[his] net worth at over $53,000,000" in the company as of January 1, 2015. He did not challenge this number nor did he propose any other calculations. The trial court used Husband's own spreadsheet (Exhibit A1 of the Agreement) to determine that his net equity after debt and expenses was $53,164,937. Husband

made no argument to the trial court that the list of expenses on the spreadsheet did not include the liquidation costs under the Agreement or were somehow incorrect.

{¶ 40} Regarding Mr. Fitzgerald, the trial court's reference to its exclusion of his testimony pertained to its calculation of Husband's Post Marital Net Assets. Husband made no reference in his trial brief to Mr. Fitzgerald's testimony, as he does here on appeal, regarding $29,044,296 in capital gains, a net investment income tax of 3.8%, or an Ohio tax of $1,393,255 in calculating his Post Marital Net Assets. Husband said nothing in his trial brief about the amount of conveyance fees. Other than requesting a three percent broker's commission, which the court included in its calculations, Husband made no argument in the trial court about Mr. Fitzgerald's testimony as to the taxes, expenses, financing fees, conveyance fees etc., that the court should have utilized as a reduction in its calculation of his Post Marital Assets under the Agreement.

{¶ 41} Therefore, as Husband did not raise these issues in the trial court, he is raising them for the first time on appeal which we have repeatedly said means we cannot consider them absent plain error. *Tate*, 2022-Ohio-4745, at ¶ 19, 20 (8th Dist.). Husband does not argue plain error. Even if Husband had properly preserved his challenge regarding Mr. Fitzgerald's testimony, his argument would fail. Mr. Fitgerald's report was identified as Exhibit 133 but it was never admitted into evidence. Mr. Fitzgerald prepared the report so that Mr. Blaugrund could use it to complete his business valuation, but as the trial court noted, Mr. Blaugrund did not testify nor did either party submit his business valuation report for

consideration by the court. It is not an abuse of discretion to decline to consider testimony based on reports that were not admitted into evidence.

{¶ 42} As for Husband's third argument, he maintains that the trial court's finding that he lacked credibility because of his violations of the mutual restraining orders was contrary to the evidence. In support, he states that "[t]he Company was not restrained from its ordinary course of business until on or about April 18, 2024, when it was made a party to the divorce action and restraining orders were implemented." Yet, on April 14, 2022, two years prior, Husband's counsel moved for partial release of temporary mutual restraining order so that 629 Euclid could be sold. Thus, Husband's argument fails as his own motion contends that a mutual restraining order was in effect well before April 18, 2024. Also, the court's final judgment entry recites several incidents where Husband testified that he felt justified in violating the mutual restraining orders because of the delays in the litigation and Husband does not dispute those findings.

{¶ 43} Nonetheless, even if Husband was correct that the court erred in finding that he was not credible based on his potential violations of the mutual restraining orders, the court found that Husband lacked credibility for many other reasons. In its final judgment entry, the court listed numerous examples of Husband's lack of credibility: the lack of candor by Husband and his family that prevented the court from having a full picture of the properties owned by them; the multiple substitutions of counsel; the lack of prepared expert witnesses; Husband's lack of responsiveness to discovery; the various appeals that contributed to delays;

the wedding between Husband and Dr. Basak Can while Husband was still married to Wife which Husband characterized as a Jewish religious celebration but that the court found was a "collaborative effort . . . to deny the plain truth . . . and goes to the credibility of [Husband] and his witnesses[;]"and three pages dedicated to the subject of "*What is MRN?*" that described the inconsistencies and confusion between various witnesses as to the ownership and holdings of MRN, particularly as it related to AJAPPJR, a company owned by both Husband and J.M. Therefore, considering the many other reasons why the court found that Husband lacked credibility, even if it erred in finding that he violated the mutual restraining orders, its overall determination that Husband lacked credibility would have been unaffected. Husband's argument on this point is overruled.

{¶ 44} All the trial court's findings under the R.C. 3105.171(F) factors are supported by record evidence as recited in its findings and conclusions, including but not limited to the 2022 Cash Flow Report (Exhibit 88), the 2015 list of premarital assets attached to the Agreement, and the testimony of the parties. Thus, the trial court's calculation of Husband's payment to Wife for her share of the division of property was supported by competent, credible evidence.

{¶ 45} Accordingly, based on the foregoing, Husband's third assignment of error is overruled.

**ASSIGNMENT OF ERROR NO. 4:**
**THE TRIAL COURT ABUSED ITS DISCRETION IN ITS FINDING THAT DENIAL OF SPOUSAL SUPPORT UNDER THESE CIRCUMSTANCES WOULD BE UNCONSCIONABLE.**

{¶ 46} The trial court concluded that despite the parties' waiver of spousal support in the Agreement, "it would be unconscionable for the Court to deny spousal support to [Wife] who was unemployed at the time of the separation and without means while [Husband] has had almost unlimited funds at his disposal." Thereafter, upon considering all the R.C. 3105.18(C)(1) factors and making express findings under each one, the court then found that:

> it is appropriate and reasonable for [Husband] to pay spousal support to [Wife] in the form of the direct payments for the monthly mortgage, real estate taxes, homeowner's insurance, gas, electric, water, sewer, internet and maintenance including the exterminator for the marital residence . . . until such time as [Wife] receives her property division payment in FULL, subject, however, with a grace period for [Wife] to find alternate housing.

{¶ 47} When reviewing the spousal support provisions of a prenuptial agreement, the court must apply a "further standard of review [beyond the three elements required for enforceability] . . . one of conscionability of the provisions at the time of the divorce[.]" *Gross*, 11 Ohio St.3d at 109 (1984). "Because the provisions related to spousal support have the ability to become invalid based on a change in circumstances of one of the parties to the marriage, a court must review the circumstances of the parties as they exist at the time of the divorce to determine if they remain conscionable." *Saari v. Saari*, 2009-Ohio-4940, ¶ 10 (9th Dist.), citing *Gross* at 109.

{¶ 48} The analysis of whether spousal support provisions are unconscionable at the time of the divorce is guided by the factors applicable to the initial determination of spousal support pursuant to R.C. 3105.18(C)(1). *Gross* at 109-110. "In determining whether to grant spousal support and in determining the amount and duration of the payments, the trial court must consider the factors listed in R.C. 3105.18(C)(1)(a)-(n)." *Hloska v. Hloska*, 2015-Ohio-2153 ¶ 10 (8th Dist.). The goal of spousal support is to reach an equitable result and there is no set mathematical formula to reach this goal. *Id*. at ¶ 11. In determining spousal support, the trial court must weigh all the factors listed in R.C. 3105.18(C) and not base its determination on any single factor in isolation. *Kaechele v. Kaechele*, 35 Ohio St.3d 93, 96 (1988) The trial court need not comment on each factor, but the record must demonstrate that the court considered each factor in making its spousal support award. *La Spisa*, 2023-Ohio-3467, at ¶ 91 (8th Dist.)

{¶ 49} An appellate court's review of a trial court's decision regarding conscionability of a spousal support provision in an antenuptial agreement "implicates a mixed question of law and fact." *Mann v. Mann*, 2010-Ohio-1489, ¶ 10 (9th Dist.). A determination of whether a written contract is unconscionable is an issue of law that is reviewed de novo. *Taylor Bldg. Corp. of Am. v. Benfield*, 2008-Ohio-938, ¶ 34. "When a trial court makes factual findings, however, supporting its determination that a contract is or is not unconscionable . . . those factual findings should be reviewed with great deference." *Id*. at ¶ 37.

{¶ 50} Husband correctly asserts that the analysis of whether spousal support provisions are unconscionable at the time of the divorce is governed by the R.C. 3105.18(C)(1) factors. The trial court made detailed, express findings as to each of the R.C. 3105.18(C)(1) factors. Husband does not challenge any of the trial court's findings as to those factors. Husband argues that the trial court erred in awarding spousal support to Wife because she has already received four years' worth of temporary support for a five-year marriage and has had plenty of time during the pendency of the parties' divorce to obtain employment, and thus, the purpose of spousal support to mitigate the drastic and abrupt lifestyle changes occasioned by divorce has been satisfied. Other than this general argument that Wife no longer needs spousal support because she has had time to find employment and, in his opinion can work, Husband does not identify with any record evidence or argument how the trial court erred in its findings regarding any of the R.C. 3105.18(C)(1) factors.

{¶ 51} Moreover, the trial court's findings are based in part on Husband's overall lack of credibility and whether he might delay the division of property. As spousal support is to be paid only until Husband pays the property division, it is not an abuse of discretion to find that the statutory factors support an award until the property division permits Wife to be financially independent. Husband's argument does not challenge his lack of credibility.

{¶ 52} Accordingly, as Husband has once again failed to meet his burden on appeal by failing to properly support his argument, Husband's fourth assignment of error is overruled.

**ASSIGNMENT OF ERROR NO. 5:**
**THE TRIAL COURT ERRED IN ITS CHILD SUPPORT CALCULATION**.

**ASSIGNMENT OF ERROR NO. 6:**
**THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN APPLYING AN UPWARD DEVIATION TO THE CHILD SUPPORT WORKSHEET CALCULATION.**

{¶ 53} Husband's fifth and sixth assignments of error will be addressed together as their analysis is intertwined.

{¶ 54} R.C. 3119.02 provides that a parent's child support obligation shall be calculated under the basic child support schedule, the applicable guideline worksheet, and the other provisions of Revised Code Chapter 3119. However, pursuant to R.C. 3119.04, if the combined annual income of both parties is greater than the maximum annual income listed on the guideline worksheet, the court "shall determine the amount of the obligor's child support obligation on a case-by-case basis and shall consider the needs and the standard of living of the children who are the subject of the child support order and of the parents." R.C. 3119.04.

{¶ 55} In this case, the trial court concluded that the parties' combined income exceeded the maximum under the basic child support schedule, and therefore, pursuant to R.C. 3119.04, the child support obligation had to be determined on a case-by-case basis. The trial court's guideline worksheet utilized the $336,000 income cap to arrive at a baseline from which to determine

appropriate support of $3665.77 ($1832.83 per child) and total cash medical support of $80.70. After considering the needs and standard of living of the children and the parents, the court found that the guideline amount would be inappropriate and not in the best interest of the children, and ordered Husband to pay child support to Wife in the amount of $8,000 per month ($4000 per child) and cash medical support in the amount of $80.70 ($40.35).

{¶ 56} Regarding the parties' incomes, the trial court determined that Wife was voluntarily unemployed and imputed to her potential income in the annual amount of $20,900, which represents minimum wage in Ohio. In arriving at that income figure, the court found that Wife did not have any prior employment other than owning an art gallery for a period of time that made no money; that she had a bachelor's and master's degree; that she had no mental or physical disabilities; and that she could work while the children were in school. The court noted that no evidence was presented regarding the availability of employment to Wife in the geographic area or as to any special skills and training that she possessed.

{¶ 57} Regarding Husband's income, the trial court found that he did not provide any income documentation, so it relied instead on the tax returns submitted by Husband's brother, J.M., who testified that his income was the same as Husband's because they were equal business partners. The court found that Husband receives a monthly draw from AJAPPJR, LLC in the amount of $17,500 ($210,000 annually) and interest income from several businesses in the average amount of $198,730 per year (using 2019-2021), for a total annual income of

$408,730. The court noted that this was a conservative number as Wife testified that Husband's income was $439,000 based on a tax form K-1 belonging to Husband, and that a loan application reflected that he earned $463,00 in interest income in 2019 in addition to $163,000 in cash distributions.

{¶ 58} In his fifth assignment of error, Husband does not dispute the trial court's finding that Wife is voluntarily unemployed. Rather, he argues that the trial court erred in only imputing minimum wage to Wife, asserting that "[i]t is reasonable and appropriate to impute an income of $50,000 to [her]." In support of his argument, Husband states that:

> [Wife] holds a masters degree in psychology and testified to running an art gallery. She is in good health. There is no evidence [Wife] is limited to minimum wage positions. . . . Certainly, with her qualifications, [Wife] could earn far more than $26,000.00 per year.

{¶ 59} "Whether a parent is 'voluntarily unemployed' is a matter to be determined by the trial court based upon the facts and circumstances of each case." *Phelps v. Saffian*, 2016-Ohio-5514, ¶ 43 (8th Dist.) "Absent an abuse of discretion, that factual determination will not be disturbed on appeal." *Rock v. Cabral*, 67 Ohio St.3d 108, 112 (1993). We incorporate the abuse of discretion standard utilized above.

{¶ 60} Pursuant to R.C. 3119.01(C)(18)(a)(i)-(xi), the trial court must consider the following factors when imputing income to a parent: the parent's prior employment experience; the parent's education; the parent's physical and mental disability, if any; the availability of employment in the geographic area in which the

parent lives; the parent's special skills and training; the age and special needs of the child for whom child support is being calculated; the parent's increased earning capacity because of experience; the parent's decreased earning capacity because of a felony conviction; and any other relevant factor. As noted above, the trial court expressly addressed each of those factors in support of its decision to impute income to Wife in the amount of $20,900.

{¶ 61} Husband's request to impute $50,000 to Wife is based solely on his personal opinion and is unsupported by any record evidence pertaining to the statutory factors, nor does Husband point to any evidence that disputes any of the trial court's findings regarding the factors. For example, although Husband claims Wife could earn much more than minimum wage, he did not present a vocational assessment or any other expert opinion regarding Wife's suitability for employment in a particular occupation given her employment history and education. He did not present a list of job openings in the area for which she is qualified. While he claims that the court erred in finding that Wife did not work prior to or during the marriage, the transcript reference he provides in his brief is Wife's testimony that she had an art gallery that made no money and that Husband terminated the lease in 2022. Thus, Husband's claim that wife worked during the marriage does not support his allegation that she could earn $50,000 in that occupation.

{¶ 62} As for Husband's own income, while he does not use the exact words in his merit brief that the trial court committed error, he states that "[t]here is no evidence that [Husband] receives any other income" than the "$13,500.00 per

month from the Company as a distribution" and "$500.00 per month from [R.M.], as and for rental income . . . ." We will treat those statements as Husband's challenge to the trial court's use of $408,730.00 as his income for child support purposes. "Because a determination of gross income for support purposes is a factual finding, we must review the trial court's decision to determine whether it is supported by competent, credible evidence." *Trolli v. Trolli,* 2015-Ohio-4487, ¶ 45 (8th Dist.)

{¶ 63} In support of his argument, Husband relies solely on his and his brother J.M.'s testimony. He does not point to any documentation contradicting the trial court's finding that his income is $408,730 as reflected on J.M.'s tax returns. His tax returns are not in the record because he failed to produce them. He does not contradict his loan application's representation that he earned $463,000 in 2019. The court, as the trier of fact, was in the best position to make credibility determinations and, as previously noted, we "must always be mindful of the presumption in favor of the finder of fact." *Eastley,* 2012-Ohio-2179, at ¶ 21. The court found his brother's tax returns to be more credible than Husband's and R.M.'s testimony on this issue which it was permitted to do.

{¶ 64} Based on the foregoing, the trial court did not abuse its discretion by imputing $20,900 in income to Wife as the court properly considered the relevant statutory factors. The court's finding that Husband's income was $408,730 for child support purposes was a supported by competent, credible evidence in the form of tax returns. Husband's fifth assignment of error is overruled.

{¶ 65} In his sixth assignment of error, Husband argues that the trial court's upward "deviation" in child support is not equitable nor in the children's best interest. Husband argues specifically that the children have no special needs, and the trial court improperly considered the standard of living of the children's cousins. Husband characterizes this alleged "deviation" as "de facto spousal support" intended to prolong Wife's excessive standard of living post-divorce. We disagree with Husband.

{¶ 66} First, Husband mischaracterizes the trial court's child support award as a "deviation." As explained in our analysis under Husband's fifth assignment of error, because the parties' combined income exceeded the maximum on the basic child support schedule, the support guidelines do not apply. "[I]nstead, the court must determine child support on a case-by-case basis." *Siebert v. Tavarez*, 2007-Ohio-2643, ¶ 31 (8th Dist.). Pursuant to R.C. 3119.04, "the only statutory requirement is that the trial court consider 'the needs and the standard of living of the children [. . .] and of the parents' in determining the amount of the obligor's child support obligation." *V.C. v. O.C.*, 2022-Ohio-1506, ¶ 8 (8th Dist.). "We have expressly stated that R.C. 3119.22, relating to deviations from the child support schedule for listed combined incomes, is no longer applicable in the case-by-case approach." *Siebert* at ¶ 31. The statute does not provide any factors that the court must use to determine the amount of child support nor is the trial court required to explain or provide specific reasons in support of its determination of the amount of support. *V.C.* at ¶ 8. This determination is within the discretion of the trial court,

and we review it for an abuse of that discretion. *V.C.* at ¶ 10. Again, we incorporate the abuse of discretion standard utilized above.

{¶ 67} The trial court made the following findings regarding the needs and standard of living of the children and parents: Husband has stopped seeking time with the children, leaving the entire burden of the children with Wife; Husband's income could not accurately be determined beyond the $408,730 calculated as a minimum; the children's standard should be the same as for Husband's other child and what it would have been had the parties' remained married; and the court declined to make a separate order for private school. The court noted parenthetically that J.M.'s children have trust funds which are funded while the parties' children have trust funds that are not funded, presumably pointing out that Husband does not plan to provide for his children. Based on these findings, we cannot say the trial court abused its discretion.

{¶ 68} Further, Husband does not challenge any of these findings with any citations to testimony or other record evidence to support his claims that the support award is excessive, unreasonable, and not in the best interest of the children. Accordingly, based on Husband's failure to meet his burden on appeal, we cannot say that the trial court's child support award constitutes an abuse of discretion. Husband's sixth assignment of error is overruled.

**ASSIGNMENT OF ERROR NO. 7:**
**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FOUND THAT [HUSBAND] WAS I[N] ARREARS FOR THE NONPAYMENT OF [WIFE'S] INTERIM ATTORNEY FEES.**

{¶ 69} On March 14, 2024, Wife filed an emergency motion for interim attorney fees in the amount of $250,000. Husband responded in opposition. The court granted Wife's motion and ordered Husband to advance $250,000 to Wife's counsel within seven days of the entry. Wife subsequently moved to show cause based on Husband's failure to comply with the order.

{¶ 70} The trial court concluded that:

as of the end of trial, the interim fees were not paid. [Husband] paid $1500. He testified that he asked his brother [J.M.] for the money but did nothing else to pay or comply with this order. [Husband] is in contempt of Court for this failure to comply. The Court notes that [Husband] testified to borrowing money from his father during this case for other things.

{¶ 71} The court ordered that Husband was in civil contempt in the amount of $248,500 for interim attorney fees as of April 24, 2024. Husband was sentenced and purge conditions were established.

{¶ 72} Husband argues on appeal that the attorney fee award was contrary to the language of the Agreement which provided that each party would be responsible for their own personal debt. He also argued that Wife caused an unnecessary increase in litigation costs by prolonging the litigation, and thus, the attorney fee award was unnecessary. To reiterate, this Court reviews a trial court's decision concerning a finding of contempt for an abuse of discretion. *Perkins,* 2013-Ohio-265, at ¶ 9 (8th Dist.),

{¶ 73} Husband's captioned assignment of error challenges the trial court's finding of contempt regarding the order to pay Wife attorney fees in the amount of $248,500. However, Husband's actual argument challenges the appropriateness of the underlying award of attorney fees that gave rise to Wife's motion to show cause. He does not deny that he failed to comply with the order or assert that he made any payments other than $1500. His argument is that he should not have to comply with the order because he should not have been responsible for Wife's attorney fees in the first place. "'This court rules on assignments of error, not mere arguments.'" *Meehan v. Meehan*, 2023-Ohio-2772, ¶ 69 (8th Dist.), quoting *Huntington Natl. Bank v. Burda*, 2009-Ohio-1752, ¶ 21 (10th Dist.); *see also* App.R. 12(A)(2) ("[t]he court may disregard an assignment of error presented for review if the party raising it fails to . . . argue the assignment separately in the brief as required under App.R. 16(A).") Because Husband's arguments go beyond the scope of his captioned assignment of error and he did not separately challenge the court's award of interim attorney fees, this Court declines to address those arguments.

{¶ 74} Even if we could reach the merits of Husband's argument, it would be overruled for Husband's failure to properly raise the matter in the trial court below. Husband's brief in opposition to Wife's motion for attorney fees did not contain any argument that finding Husband in arrears for attorney's fees would be inconsistent with the language of the Agreement. His argument was that Wife failed to provide an itemized statement pursuant to Loc.R. 21; that Wife's monthly support is sufficient to allow her to pay her own attorney fees; that Wife's allegation of

Husband's misconduct is unfounded; and that he does not have the money to pay Wife's attorney fees. Again, as previously discussed, we cannot consider arguments raised for the first time on appeal absent plain error and Husband does not argue plain error. *Tate*, 2022-Ohio-4745, at ¶ 19, 20 (8th Dist.).

{¶ 75} For all the reasons set forth above, Husband's seventh assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. 8:
### THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT ISSUED AN UNREASONABLE AND IMPOSSIBLE PURGE OF [HUSBAND'S] CONTEMPT.

{¶ 76} Husband was found in civil contempt for nonpayment of temporary support in the amount of $28,808.58, and nonpayment of Wife's interim attorney fees in the amount of $248,500. The trial court sentenced Husband to 100 hours of community service for each contempt, for a total of 200 hours, to be completed within 60 days unless he purged the contempt. The purge condition was payment of the arrearages within 30 days of the contempt order. Husband argues that 200 hours of community service to be completed within 60 days is unreasonable and that compliance would be impossible due to his employment. Husband requested that the court adjust the requisite hours and timeline for completion.

{¶ 77} Wife's counsel informed the Court at oral argument that Husband had paid the temporary support arrearage of $28,808 and completed 100 hours of community service. Considering those facts, Husband's counsel agreed that this

assignment of error is moot but reserved for appellate review the issue of the underlying arrearages as set forth under his first and seventh assignments of error.

{¶ 78} Therefore, based on the foregoing, Husband's eighth assignment of error is overruled as moot.

**Wife's Cross-Appeal**
**ASSIGNMENT OF ERROR I:**
**THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION IN ITS VALUATION OF [HUSBAND'S] BUSINESS INTERESTS/POST MARITAL ASSETS**

{¶ 79} Wife argues here that the trial court erred in its calculation in the valuation of Husband's Post Marital Net Assets because Husband's personal financial statements, as set forth in Exhibit YYYYY, revealed that his Post Marital Assets consisted of cash, savings, and checking in the amount of $2,750,000.00, and real estate in the amount of $39,259,902.00 (Exhibit YYYYY value of $92,619,839 minus Agreement Exhibit A1 value of $53,359,937). Wife further states that the trial court's valuation was "contrary to the record and the sworn declarations made by [Husband] to Buckey[e] Community Bank . . . . *See Exhibit YYYYY.*"

{¶ 80} In reviewing the record, Exhibit YYYYY was never admitted into evidence. On April 24, 2024, the last day of trial, both parties' counsel orally moved their exhibits into evidence. According to the transcript, Exhibit YYYYY was not included in the list of exhibits moved into evidence by either party. Therefore, as Exhibit YYYYY was never admitted into evidence, the court did not err in failing to consider it in its valuation of Husband's Post Marital assets.

{¶ 81} To the extent that Exhibit YYYYY was allegedly part of Husband's "sworn declarations" made to Buckeye Community Bank in his loan application, which was admitted into evidence as Wife's Exhibit LLLLL, it is not attached to Exhibit LLLLL.

{¶ 82} Accordingly, based on the foregoing, Wife's first assignment of error is without merit and is overruled.

**ASSIGNMENT OF ERROR II:**
**THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION BY FAILING TO HOLD [HUSBAND] IN DIRECT CONTEMPT FOR HIS IMPROPER CONDUCT DURING THE TRIAL IN THIS MATTER.**

{¶ 83} Here, Wife argues that the trial court abused its discretion by failing to hold Husband in contempt for his repeated outbursts and threatening conduct throughout the proceedings. Wife points to several incidents as examples of the court's failure in this regard. The first occurred during Husband's cross-examination on the morning of March 29, 2024, when he began taking photographs of Wife and Wife's counsel from the witness stand. When Wife's counsel objected, Husband began using profanity towards Wife's counsel. The court's deputy intervened, instructing and admonishing Husband at length to cease his conduct and inquiring if he understood. Wife's counsel then orally moved for Husband to be found in direct contempt and sent to jail over the weekend. The trial judge indicated that while she would hold a contempt hearing to address Husband's behavior, she was not going to do so at that time and would wait until the end of the day. As the matter proceeded, the court repeatedly admonished Husband to stop talking and to

respond only to the questions asked rather than offer his unsolicited opinions. The court took a recess to give everyone time to regain composure.

{¶ 84} The next incident that Wife raises occurred shortly after the lunch break later that same day. The trial judge threatened that if Husband continued talking, she would "just call the sheriff and send him on his way." The last incident that Wife raises occurred near the end of the same day when Wife's counsel renewed his request for a direct contempt hearing. The court proceeded to admonish Husband as follows:

> Sir, [] any of the comments that you have made at any point in this time could be construed as impeding the process. . . . I'm not going to be finding you in contempt today. But you understand that, at any point, if you say something that is inappropriate, there is certainly enough evidence already that you have tried to impede the process. I have not let you impede it, because I have just kept everyone going. But at some point, I may not be able to do that anymore. You need to understand that you are in serious jeopardy here. And it's not funny. . . . Also you could be sentenced in the future. So just because you are not going [to jail] this weekend, it doesn't mean that it won't be a weekend when you do ultimately go, if it comes to that.

Following the above admonishment, Wife's counsel objected, stating that the court's statements were not sufficient to properly address Husband's behavior.

{¶ 85} "*Direct contempt is an act 'of misbehavior in the presence of or so near the court or judge as to obstruct the administration of justice.*'" (Emphasis in original.) *In re McGinty*, 30 Ohio App.3d 219, 223 (8th Dist. 1986) quoting R.C. 2705.01. R.C. 2705.01 provides that "[a] court, or judge at chambers, may summarily punish a person guilty of misbehavior in the presence of or so near the court or judge as to obstruct the administration of justice." "[S]ince the primary

interest involved in a contempt proceeding is the authority and proper functioning of the court, great reliance should be placed upon the discretion of the trial judge." *Denovchek v. Bd. of Trumbull Cty. Commrs.*, 36 Ohio St.3d 14, 16 (1988). Again, we review a trial court's decision regarding contempt under an abuse of discretion standard. *Perkins*, 2013-Ohio-265, at ¶ 9 (8th Dist.). We incorporate by reference the abuse of discretion standard utilized above.

{¶ 86} First, App.R. 16(A)(8) requires that "[t]he appellant shall include in its brief. . . [a] conclusion briefly stating the *precise* relief sought." (Emphasis added.) Here, Wife states in her conclusion that she "requests that this Court hold [Husband] accountable[.]" However, she does not specify what judgment she wishes this Court to issue that would hold Husband accountable. Thus, she has not made a request for any "precise relief" as required by App.R. 16(A)(8). Accordingly, Wife has not met her burden on appeal regarding this assignment of error.

{¶ 87} Despite Wife's failure to meet her burden on appeal, we have nonetheless reviewed the transcript and conclude that the trial court did not abuse its discretion in failing to hold Husband in contempt. It is clear from the record that in each of the incidents at issue, the trial court addressed Husband's behavior immediately, admonishing him to cease his misconduct and warning him of the consequences of any future infractions, including a potential jail sentence. Keeping in mind that the trial judge has wide discretion in managing and controlling the functioning of her courtroom, there is nothing in the record reflecting that she neglected to address any of the matters now challenged by Wife. The court was

clearly attempting to balance the necessity of keeping the trial moving forward with managing Husband's disruptions.

{¶ 88} Based on the record before us we cannot conclude that this is a case where the court showed "perversity of will, not the exercise of judgment but defiance thereof" that constitutes an abuse of discretion. *Weaver*, 2022-Ohio-4371, at ¶ 24. Accordingly, Wife's second assignment of error is overruled.

### III.

{¶ 89} Based on the foregoing, Husband's assignments of error are overruled. Wife's assignments of error are also overruled. The judgment of the Cuyahoga County Court of Common Pleas, Domestic Relations Division, is affirmed.

{¶ 90} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
SCOT ALLAN STEVENSON, JUDGE

BETTY SUTTON, P.J., and
JILL FLAGG LANZINGER, J., CONCUR IN JUDGMENT ONLY

(Sutton, J., Stevenson, J., and Flagg Lanzinger, J., of the Ninth District Court of Appeals, sitting by assignment.)